IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICIA ARUDA,<br><br>Defendant. | Case No. 14-cr-00577-DKW<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR A SENTENCE REDUCTION** |

Approximately 59 months into her 130-month term of imprisonment, inmate Patricia Aruda asks the Court to reduce her prison sentence "to time served" because the rising number of COVID-19 cases at the medical facility where she is incarcerated, combined with her health conditions, constitute what she believes are "extraordinary and compelling" circumstances that warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i).  Dkt. No. 155-1 at 3–10.

Although Aruda's current situation rises to the level of "extraordinary and compelling," she still poses a danger to the community, and the Court is not persuaded that the sentencing factors under 18 U.S.C. Section 3553(a) counsel in favor of releasing her, particularly when she has served less than half of her term of imprisonment.[1]  Accordingly, Aruda's motion is DENIED.

---

[1] *See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13 cmt. n.1.

## FACTUAL & PROCEDURAL BACKGROUND

On April 29, 2015, Patricia Aruda pled guilty to possession with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Dkt. Nos. 11, 61; Dkt. No. 115, ¶¶ 1, 5.  Aruda was ultimately held responsible for 1,407.2 grams (3.1 pounds) of high-purity methamphetamine, also known as "ice"; and 476.84 grams (1.05 pounds) of generic methamphetamine.  Dkt. No. 115, ¶¶ 22, 30–31; *cf.* U.S.S.G. § 2D1.1 cmt. n.8.  She was also in possession of $18,500 in drug proceeds discovered during a law enforcement search of her residence.  Dkt. No. 115, ¶¶ 21, 29.

Aruda's offense carried a minimum term of 10 years' imprisonment and at least 5 years' supervised release, with a maximum term of life in prison.  Dkt. No. 115, ¶¶ 96, 99; 21 U.S.C. § 841(b)(1)(A).  After accounting for the offense level and Aruda's prior criminal history, the Sentencing Guidelines yielded a recommended range of 151 to 188 months' imprisonment.  Dkt. No. 115, ¶¶ 97, 100.  While Aruda was on pretrial release awaiting sentencing, she admitted to testing positive for methamphetamine on April 28, 2015.  *Id.* at ¶ 7.  The Court reprimanded Aruda and again released her on the previously imposed bail conditions, *id.*, but roughly four months later, Aruda was again arrested for having tested positive for

methamphetamine.  *Id.* at ¶ 7a.  As a result, on August 7, 2015, the Court revoked Aruda's pretrial release and remanded her into federal custody.  *Id.*; Dkt. No. 79.

On December 7, 2015, after adopting the presentence investigation report (PSR) in full, Dkt. No. 121, the Court sentenced Aruda to 130 months' imprisonment followed by five years' supervised release—a sentence below the Guidelines range. Dkt. No. 121, 122.

Aruda is currently 54 years of age and incarcerated at Carswell Federal Medical Center (FMC),[2] a low-security all-female medical facility in Tarrant County, Texas.[3]  Aruda's most recent medical records indicate she is 5 feet 2 inches tall and weighs 168 pounds (Body Mass Index of 30.7), Dkt. No. 155-18 at 166; Dkt. No. 160-14 at 3, and that she currently has the following mental and physical health conditions: hypothyroidism; obesity; bipolar disorder; anxiety and depression; arthritis; urinary and fecal incontinence; and high cholesterol.  Dkt. No. 155-18 at 7, 16–17, 26, 39–41, 48–49, 54, 57, 104; Dkt. No. 160-14 at 2–3, 5, 28.  Aruda has served approximately 59 months of her 130-month sentence and, with good behavior, is projected to be released on October 2, 2024.  Dkt. No. 155-14 at 3.[4]

---

[2]*Find an Inmate*, FEDERAL BUREAU OF PRISONS (BOP), https://www.bop.gov/inmateloc/ (last visited July 14, 2020).
[3]*FMC Carswell*, BOP, https://www.bop.gov/locations/institutions/crw/ (last visited July 14, 2020).
[4]*See also supra* n.2.

## STANDARD OF REVIEW

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (alterations in original) (quoting 18 U.S.C. § 3582(b)). Such circumstances must be "expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Dillon*, 560 U.S. at 827, 831; *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003). Congress carved out such an exception in 18 U.S.C. Section 3582(c)(1)(A)(i), as amended by the First Step Act of 2018 (FSA), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018).[5] Under Section 3582(c)(1)(A)(i), courts may "modify a term of imprisonment" where, as here, the inmate files a motion, if three requirements are satisfied:

> (1) the inmate "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion" on behalf of the inmate "or the lapse of 30 days from the receipt of such a request" by the relevant warden;[6]
>
> (2) the inmate has established that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and

---

[5] The FSA amended the *procedural requirements* under Section 3582(c)(1)(A) to permit inmates to directly petition courts for a sentence reduction, whereas pre-amendment, an inmate could only petition the BOP Director, who then had the discretion to move the court to reduce the inmate's sentence based upon "extraordinary and compelling reasons." *See* FSA § 603(b), 132 Stat. at 5239; U.S.S.G. § 1B1.13 cmt. n.4.; *see also United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).
[6] The Government concedes that Aruda has satisfied the statutory exhaustion requirements. Dkt. No. 159 at 4.

(3) the court has "consider[ed] the factors set forth in [18 U.S.C. Section] 3553(a)" and found that the inmate is "not a danger to the safety of any other person or the community, as provided under [18 U.S.C. Section] 3142(g)."

*See* 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13 (policy statement). The inmate bears the burden of establishing the requirements for a sentence reduction by a preponderance of the evidence. *See, e.g.*, *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998); *see also United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *Walton v. Ariz.*, 497 U.S. 639, 650 (1990) (holding that a defendant's due process rights "are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."), *overruled on other grounds by Ring v. Ariz.*, 536 U.S. 584, 609 (2002).

## DISCUSSION

The parties contest the second and third requirements for a sentence reduction under Section 3582(c)(1)(A)(i), as outlined above. For the reasons that follow, Aruda has satisfied the second requirement but falters on the third.

## I.    Extraordinary and Compelling Reasons

Section 3582(c)(1)(A)(i) permits a sentence reduction only upon a showing of "extraordinary and compelling reasons," and only if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" (the "Commission"). Because Aruda has shown that (1) she has one condition that puts

her at a high risk of becoming seriously ill from COVID-19 (obesity); (2) there is a high risk she may become infected by virtue of the unusually high number of COVID-19 cases among the inmate population at FMC Carswell; and (3) if she did become infected, her ability "to provide self-care within the . . . correctional facility" would be "substantially diminishe[d]" such that she may "not [be] expected to recover," Aruda's circumstances constitute "extraordinary and compelling." *See* U.S.S.G. § 1B1.13 cmt. n.1(A).

### A.    The Commission's Commentary in U.S.S.G. § 1B1.13 Defining "Extraordinary and Compelling" is Binding on Federal Courts

Congress did not delineate the bounds for what constitutes "extraordinary and compelling," except to state that "[r]ehabilitation of the defendant alone" is not enough.   28 U.S.C. § 994(t).   Instead, Congress directed the Commission to promulgate policy statements "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." *Id.*   The Commission did just that under Application Note 1 to U.S.S.G. § 1B1.13, albeit prior to the enactment of the FSA.   The Commission outlined the following four categories of circumstances that may constitute "extraordinary and compelling reasons" for a sentence reduction:

> (A) the inmate is "suffering from a terminal illness," or a "serious" physical or cognitive condition "that substantially diminishes" the inmate's ability "to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover";

(B) the defendant is at least 65 years old, is "experiencing a serious deterioration in physical or mental health because of the aging process," *and* "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less";

(C) family circumstances involving "the death or incapacitation of the caregiver of the defendant's minor child," or the "incapacitation of the defendant's spouse or registered partner," leaving the inmate as "the only available caregiver for the spouse or registered partner"; or

(D) "[a]s determined by the Director of the [BOP]," in the inmate's case there is "an extraordinary and compelling reason other than, or in combination with," the other three reasons described.

*See* U.S.S.G. § 1B1.13 cmt. n.1.

Because several district courts have concluded that the policy statement is "outdated" and does not account for the fact that an inmate may now seek relief directly from the court,[7] Aruda argues the definition of "extraordinary and compelling" is no longer limited to the examples set forth in the Commission's policy statement above, and the Court is free to "independently" make that determination.[8]   Dkt. No. 155-1 at 3 & n.2; Dkt. No. 160 at 9–11.   But as Aruda acknowledges, Dkt. No. 160 at 10, this Court has rejected such a freewheeling approach to compassionate release.[9]

---

[7] The Commission "has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners."  *See, e.g.*, *Brown*, 411 F. Supp. 3d at 449 (citations omitted)).

[8] *See, e.g.*, *Rodriguez*, 424 F. Supp. 3d at 681 (collecting cases); *Singui*, 2020 WL 2523114, at *4 (C.D. Cal. May 18, 2020) (collecting cases); *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019); *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020).

[9] *See United States v. Kealoha*, No. CR 04-00265, 2020 WL 3735773, at *5–6 (D. Haw. July 6,

Courts are not at liberty to treat the Commission's commentary as merely "persuasive," "of only limited authority," or "not binding on the federal courts." *Stinson v. United States*, 508 U.S. 36, 39, 44–47 (1993) (citation omitted). In *Stinson*, the Supreme Court announced "the standard that governs the decision whether particular interpretive or explanatory commentary is binding." *Id.* at 43. There, the Court explained:

> The Sentencing Commission promulgates the guidelines by virtue of an express congressional delegation of authority for rulemaking, and through the informal rulemaking procedures. Thus, the guidelines are the equivalent of legislative rules adopted by federal agencies. The functional purpose of commentary (of the kind at issue here) is to assist in the interpretation and application of those rules, which are within the Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce. In these respects this type of commentary is akin to an agency's interpretation of its own legislative rules. As we have often stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."

*Stinson*, 508 U.S. at 44–45 (internal citations omitted) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Thus, the Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is

---

2020); *United States v. Kazanowski*, No. 15-CR-00459, 2020 WL 3578310, at *6 (D. Haw. July 1, 2020); *United States v. Lum*, No. 18-CR-00073, 2020 WL 3472908, at *3 (D. Haw. June 25, 2020).

authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38.[10]

Here, the FSA only amended the *procedural requirements* under Section 3582(c)(1). *See supra* n.5. An inmate may now personally petition a court under Section 3582(c)(1). The mere fact that the Commission has not accounted for this change in U.S.S.G. § 1B1.13 simply means a court must nevertheless entertain a motion from an inmate. But this does not nullify the Commission's entire policy statement or the commentary defining "extraordinary and compelling," nor does it somehow render that guidance "outdated." *See* 18 U.S.C. § 3553(a)(5) (any "pertinent policy statement" is to be considered "subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into the amendments issued under section 994(p) of title 28.")). For the same reason, Application Note 1(D) to U.S.S.G. § 1B1.13 is not inconsistent with Section 3582(c)(1). Contrary to what Aruda argues, Note 1(D) is not a "catch-all" provision through which the Court may take the place of the BOP Director and identify some "other" extraordinary and

---

[10]Although *Stinson* was decided before *United States v. Booker*, 543 U.S. 220, 246 (2005), in which the Supreme Court held that the Guidelines are advisory, not mandatory, the Supreme Court later held in *Dillon* that *Booker* is inapplicable in sentence-modification proceedings under 18 U.S.C. § 3582(c)(2) because such proceedings are fundamentally different, *see Dillon v. United States*, 560 U.S. 817, 828–30 (2010), and, as such, the relevant Guidelines policy statement "constrained" courts. *See id.* at 825–27. The same rationale applies to Section 3582(c)(1), the companion statutory provision to the one addressed in *Dillon.*

compelling reason for an inmate's early release.  Dkt. No. 160 at 10–11.  Note 1(D) still applies "with full force if the *Director* invokes it in moving for a sentence reduction," and the "fact that Note 1(D) is unavailable if the *defendant* moves for a sentence reduction does not render it inconsistent with § 3582(c)(1)(A)(i); rather, Note 1(D) is simply inoperative in that circumstance."  *See, e.g.*, *United States v. Rollins*, No. 99 CR 771-1, 2020 WL 3077593, at *1–2 (N.D. Ill. June 10, 2020). Indeed, in enacting the FSA, Congress did not alter the meaning of "extraordinary and compelling," nor did it revoke the Commission's authority to define that phrase. *See Mistretta v. United States*, 488 U.S. 361, 393–94 (1989) (Congress may "revoke or amend any or all of the Guidelines . . . at any time").

Therefore, because Application Note 1 to U.S.S.G. § 1B1.13 does not run afoul of the Constitution or a federal statute, and is not "plainly erroneous or inconsistent" with Section 1B1.13, the Commission's "commentary is a binding interpretation of the phrase '[extraordinary and compelling].'"  *Stinson*, 508 U.S. at 47; *see also Dillon*, 560 U.S. at 824 (explaining that a district court's discretion to modify a sentence under Section 3582(c)(2) is "constrained by the Commission's statements").[11]  In so holding, this Court is among the numerous district courts that,

---

[11]Numerous courts have appropriately turned to *Stinson* and reached the same conclusion.  *See, e.g.*, *United States v. Garcia*, No. 4:05-CR-40098, 2020 WL 2039227, at *3–5 (C.D. Ill. Apr. 28, 2020); *United States v. Sandoval*, No. CR14-5105RBL, 2020 WL 3077152, at *3–4 (W.D. Wash. June 10, 2020) (citing nine other decisions); *Rollins*, 2020 WL 3077593, at *1–2.

for various reasons, "continue to follow the guidance of the Sentencing Commission's policy statement limiting the scope of 'extraordinary and compelling reasons' that warrant compassionate release under § 3582(c)(1)."[12]

## B.    Analysis: Extraordinary and Compelling Reasons

Aruda contends her circumstances are "extraordinary and compelling" because her medical conditions—*i.e.*, "actinic keratosis (pre-cancerous skin lesions)" resulting in "topical chemotherapy treatments from 2017-2019," as well as "obesity, high cholesterol, anxiety, depression, thyroid complications, and recent suspicion of cancer resulting in at least two biopsies"—increase her "risk for serious complications should she contract COVID-19" at Carswell FMC. Dkt. No. 155-1 at 3–4.   In that regard, the only relevant "extraordinary and compelling" scenario identified by the Commission is subpart (A) of the Commission's application note. *See* U.S.S.G. § 1B1.13 cmt. n.1(A).[13]   The Court concludes Aruda has carried her burden under that provision.

---

[12]*See, e.g.*, *Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020); *Eberhart*, 2020 WL 1450745, at *2; *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020); *United States v. Gross*, No. 2:04-CR-032-RMP, 2019 WL 3538967, at *2 (E.D. Wash. Aug. 2, 2019); *United States v. Shields*, No. 12-CR-00410-BLF-1, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019).
[13]Aruda does not contend that the BOP Director has determined that there exists in this case some "other" extraordinary or compelling reason to reduce her sentence. *See* U.S.S.G. § 1B1.13 cmt. n.1(D).

Although there is a heightened risk for the virus to spread in correctional facility environments,[14] standing alone, an inmate's concerns about possible exposure to COVID-19 in the abstract are not enough to warrant an inmate's early release.  *See, e.g.*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *Riley*, 2020 WL 1819838, at *7 (collecting cases).  That type of general concern is shared by the public at large, as well as by  all incarcerated individuals.

Rather, to establish "extraordinary and compelling reasons" stemming from the current coronavirus pandemic, and for such a finding to be consistent with Application Note 1 to U.S.S.G. § 1B1.13, an inmate must necessarily establish the following three elements by a preponderance of the evidence: (1) the inmate is "suffering from a terminal illness," or a "serious" physical or cognitive condition; (2) that condition puts the inmate at a high risk of becoming seriously ill from COVID-19; and (3) if the inmate were to contract COVID-19, the inmate's ability "to provide self-care within the . . . correctional facility" would be "substantially diminishe[d]" and the inmate would "not [be] expected to recover."  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).  Aruda's current situation satisfies all three prongs.

---

[14]*See generally Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 1, 2020).

First, only one of Aruda's identified health conditions, obesity, is among the list of conditions recognized by the CDC that render an individual at an "increased risk of severe illness from COVID-19."  The CDC has stated that individuals at an "increased risk of severe illness from COVID-19" include people "aged 65 years and older,"[15] as well as people of all ages with the following underlying health conditions: (i) "Chronic kidney disease"; (ii) "COPD (chronic obstructive pulmonary disease)"; (iii) "Immunocompromised state (weakened immune system) from solid organ transplant"; (iv) "Obesity (body mass index [BMI] of 30 or higher)"; (v) "Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies"; (vi) "Sickle cell disease"; and (vii) "Type 2 diabetes mellitus."[16]   Based on Aruda's BMI of 30.7, she meets the CDC's criteria for

---

[15]*See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness – Older Adults*, CDC (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 6, 2020). The CDC states in broad terms that "[a]s you get older, your risk for severe illness from COVID-19 increases," *i.e.*, "people in their 50s are at higher risk for severe illness than people in their 40s," "people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s," and that the "greatest risk for severe illness from COVID-19 is among those aged 85 or older."  Because the CDC also notes that "8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older," *id.*, for purposes of this motion, the Court will consider age 65 as the threshold for determining whether extraordinary and compelling circumstances exist, a threshold that Aruda does not meet and has not identified as a basis for her motion.
[16]*See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness – People of Any Age with Underlying Medical Conditions*, CDC (June 25, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 6, 2020).  The CDC also notes that people with the following conditions "*might* be at an increased risk for severe illness from COVID-19": Asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as

obesity.   But aside from obesity, Aruda does not suffer from any of the other conditions in the above list provided by the CDC.   Although Aruda argues that some of her other conditions "can weaken the immune system," she is not in an "[i]mmunocompromised state . . . from *solid organ transplant*."  *Cf.* Dkt. No. 155-1 at 4–7.   Not every physical or cognitive condition that impairs immune function can be a risk factor if "extraordinary and compelling" is to have any meaning.   In any event, Aruda admits her topical skin cancer treatments ended in 2019, and "she appears to have recovered."  Dkt. No. 160 at 6–7.[17]  Neither health conditions that an inmate once suffered from nor "suspected" diagnoses have any bearing on whether an inmate's current situation is "extraordinary and compelling."  *Id.*  Nonetheless, according to the CDC, Aruda's obesity is enough to put her at an increased risk of severe illness from COVID-19.

Second, in order for Aruda's obesity (or any of her conditions) to matter, insofar as an "extraordinary and compelling" finding is concerned, Aruda must (at the very least) show that there is a high risk of contracting the virus because there are positive COVID-19 cases at Carswell FMC where she is incarcerated.   Aruda has done just that.

---

dementia; liver disease; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); smoking; thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.  *Id.* (emphasis added).

[17]*See also* Dkt. No. 155-18 at 16, 18, 83, 127, 153; Dkt. No. 160-14 at 26, 63–65, 67, 75.

Here, the risk of Aruda contracting COVID-19 at Carswell FMC is not speculative or remote. Carswell FMC currently houses a total of 1,373 inmates (*i.e.*, 1,133 inmates at the FMC and 240 at the Camp).[18] As of the date of this Order, the BOP's coronavirus-related data indicates that Carswell FMC—with 190 inmate cases; 3 staff cases; 2 inmate deaths; and 0 staff deaths—has the fifth highest number of inmate COVID-19 cases out of all BOP facilities.[19] In other words, nearly 14% of the inmate population at Carswell FMC is infected with the virus. To put that in perspective, all of the counties in Texas are below 5%.[20] Particularly troubling, during the parties' briefing on the instant motion alone, the number of inmate cases at Carswell FMC has increased exponentially, as there were 2 cases on June 16, 2020, Dkt. No. 155-1 at 10; 51 cases on July 6, Dkt. No. 160-3; 65 cases on July 8, Dkt. No. 160-4; and now there are 190 cases. In light of the high number of COVID-19 cases among the inmate population and the fact that this number has spiked over

---

[18]*FMC Carswell*, BOP, https://www.bop.gov/locations/institutions/crw/ (last visited July 14, 2020).

[19]*See COVID-19 Coronavirus: COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited July 17, 2020). On this public website containing the coronavirus-related data for BOP facilities, the BOP notes that it  "will update the open COVID-19 confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths daily at 3:00 p.m.," and because the BOP "has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting," the data is expected to reflect an increase in the number of COVID-19 positive tests. *Id.*

[20]*See Cases by County*, CDC (June 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html (last visited July 15, 2020) (noting cases per 100,000 residents and total deaths).

the past 30 days, the Court concludes there is a high risk of Aruda contracting the virus at Carswell FMC.

Lastly, Aruda has shown that, should she contract the virus, Carswell FMC is likely less equipped to treat her than if she were not incarcerated. Although the BOP reports taking measures to prevent the spread of the virus, which are as extensive (if not more) than those implemented in cities and states,[21] the recent and unusually high number of COVID-19 cases among the inmate population at Carswell FMC suggests that practices are below par at the facility, despite its status as a federal medical center. Moreover, the first coronavirus-related inmate death at Carswell FMC occurred on April 28, 2020; the inmate was 30 years of age and had a pre-existing medical condition. Dkt. No. 155-1 at 10–11. This is cause for concern considering Aruda reports that inmates are in lockdown, and she is "unable to go to the medical" unless she has chest pains, but there are "NO DOCTORS!" Dkt. No. 155-7. Assuming this is true, and in light of recent events at Carswell FMC, the Court concludes that should Aruda become infected with the coronavirus, it is likely that Aruda's ability "to provide self-care within the . . . correctional facility" would be

---

[21] *See generally BOP Implementing Modified Operations*, BOP, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 15, 2020); *A BOP COVID-19 Overview*, BOP, https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response (last visited July 15, 2020).

"substantially diminishe[d]" and Aruda would "not [be] expected to recover."  *See*

U.S.S.G. § 1B1.13 cmt. n.1(A).[22]

Accordingly, Aruda has carried her burden of showing that there are

"extraordinary and compelling reasons" to justify her early release under 18 U.S.C.

§ 3582(c)(1)(A)(i).

## II.    Section 3553(a) Factors & Risk of Danger to the Community

Although there are extraordinary and compelling reasons to support Aruda's

early release, Aruda has failed to clear the last hurdle.  As noted, the Court may only

grant Aruda's motion "after considering the factors set forth in [18 U.S.C. Section]

3553(a)" and finding that Aruda is "not a danger to the safety of any other person or

the community, as provided under [18 U.S.C. Section] 3142(g)."  *See* 18 U.S.C.

§ 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13.

Turning to the relevant factors in Section 3553(a), the Court has again

carefully reviewed the PSR and finds that Aruda's 130-month sentence is, as it was

---

[22]Aruda also alleges that "she is in lockdown, drenched in her own urine and feces" because she suffers from urinary and fecal incontinence and has been denied sufficient sanitation supplies. Dkt. No. 160 at 6, 9; Dkt. No. 155-7.  To the extent this is more than hyperbole, it is a situation that can be corrected, and Aruda may challenge the conditions of her confinement as a violation of the Eighth Amendment by filing a *Bivens* complaint against the prison employees responsible. *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 395–96 (1971); *Farmer v. Brennan*, 511 U.S. 825, 830 (1994) (*Bivens* action against BOP officials); *Carlson v. Green*, 446 U.S. 14, 16 n.1, 18–19 (1980) (same).  Aruda's request for immediate release from prison under Section 3582(c)(1) is not the appropriate vehicle to remedy this situation.  Section 3582(c)(1) covers only an inmate's circumstances that are likely "terminal," "serious," and otherwise permanent.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)–(C).  The FSA may have expanded an inmate's ability to obtain early release, but the FSA did not make Section 3582 the means to remedy every perceived deficiency in an inmate's conditions of confinement at a BOP facility.

at sentencing, "sufficient, but not greater than necessary, . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public." *See* 18 U.S.C. § 3553(a)(2). This becomes even more apparent when considering Aruda's "history and characteristics" and "the nature and circumstances" of Aruda's most recent offense. *Id.* § 3553(a)(1).

Aruda has four prior felony convictions: two forgery offenses; a controlled substance offense; and one conviction for threatening her prior probation officer. Dkt. No. 115, ¶¶ 44–49. Her probation was revoked on three occasions between 1998 and 2000 for absconding from supervision, testing positive for drug use, and committing other crimes. *Id.* at ¶ 45. Notably, Aruda committed the felony drug offenses and terroristic threatening offense while on probation. Moreover, Aruda has a long history of methamphetamine abuse, starting in 1996, along with a history of noncompliance with drug treatment and positive drug tests. *Id.* at ¶¶ 75–84. After her release from imprisonment in 2004, she reportedly refrained from methamphetamine use until 2012, when she began smoking 0.5 gram a day, 4 days a week. *Id.* at ¶ 77. Aruda has been unemployed since 2010, engaging in the illicit drug trade to help financially support her family instead of pursuing legitimate means. *Id.* at ¶¶ 25, 77, 89–92. In 2014, Aruda committed the offense for which she is now incarcerated; namely, she possessed and intended to distribute over 1,400

grams of "ice" and 238 grams of generic methamphetamine. *Id.* at 7–9. Aruda could have been sentenced to 151 to 188 months' imprisonment. Dkt. No. 115, ¶¶ 97, 100. But the Court sentenced her to 130 months—almost two years less than the bottom end of the Guideline range. The Court did so for a number of the very same reasons that Aruda now raises (*e.g.*, family support, remorse, college coursework). Dkt. No. 121 at 3. This does not justify a further reduction in her sentence.

The Court acknowledges that in the 59 months Aruda has been incarcerated, she has earned her GED; completed a significant number of other educational and drug-treatment programs; and worked as a suicide watch companion.[23] While commendable, these facts speak to just one factor. *See* 18 U.S.C. § 3553(a)(2)(D). And the Court was already aware of, and accounted for, the same health concerns Aruda now raises, with the exception that Aruda is experiencing incontinence and has gained 22 pounds, spurring her claim of obesity. *Compare* Dkt. No. 115, ¶ 67, *with*, Dkt. No. 160-14 at 3. These new circumstances, even when combined with concerns about the coronavirus pandemic, do not justify a further reduction in her sentence.

Aruda has served approximately 59 months of her 130-month sentence. Releasing her now would result in a sentence well below the mandatory minimum term applicable to her offense and would undoubtedly result in an "unwarranted

---

[23]*See* Dkt. Nos. 155-9; 155-10; 155-12

sentence disparit[y] among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6).  Thus, as the Court found on December 7, 2015, when sentencing Aruda, the Court concludes today that 130 months' imprisonment is sufficient but not greater than necessary to achieve the statutory purposes of sentencing.

Further, even assuming *arguendo* that the sentencing factors weighed in favor of Aruda's immediate release, Aruda is not entitled to such relief because the Court cannot conclude that Aruda does not pose a "danger to the safety of . . . the community, as provided under [18 U.S.C. Section] 3142(g)."[24]  Aruda argues that she is not such a danger because "there were no allegations of violence during her offense"; "her conduct did not involve firearms"; and she did not have a leadership role.  Dkt. No. 160 at 11–12.  That may very well be true, but a history of violence and firearms is not the only measure of dangerousness under Section 3142(g).  The list of factors under Section 3142(g) includes:

> (1) **the nature and circumstances of the offense charged**, including whether the offense is a crime of violence, a violation of [18 U.S.C. § 1591], a Federal crime of terrorism, or involves a minor victim or a **controlled substance**, firearm, explosive, or destructive device;
>
> (2) the **weight of the evidence** against the person;
>
> (3) the history and characteristics of the person, including—

---

[24] *See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13.

(A) **the person's character**, physical and mental condition, family ties, **employment**, financial resources, length of residence in the community, community ties, **past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings**; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g) (emphasis added).

Here, Aruda's conviction involved a significant quantity of a "controlled substance"; the "weight of the evidence" against Aruda was undeniable; and she has a long history of drug-related offenses. Although it appears Aruda has the support of her husband's family and has been classified by the BOP as a low risk for recidivism, Dkt. Nos. 155-12; 155-11, this snapshot says little about Aruda's propensity to endanger the community with narcotics when she has been incarcerated for a relatively short period of time. Despite having previously served lengthy terms of incarceration, followed by numerous opportunities under court supervision and drug treatment, Aruda's involvement in the instant offense and her continued drug use suggest that she was not deterred by her contact with the criminal justice system. In fact, Aruda was allowed release on bail during the pretrial phase for the instant offense, a period of time when the Court would have expected Aruda

to be on her best behavior, but she relapsed not once, but twice, resulting in the revocation of her bail.  Dkt. No. 115, ¶¶ 7, 7a.  Moreover, since Aruda has been in BOP custody, she has hardly been the model prisoner suggested by her briefs, instead engaging in conduct that resulted in prison discipline on multiple occasions. She was found in possession of a non-hazardous tool and lost 14 days of "good conduct time"; she misused authorized medication and refused to obey an order, which cost her 30 days of commissary privileges; and she failed to stand count, resulting in the imposition of 10 extra hours of duty.  Dkt. No. 159-3; Dkt. No. 159 at 12.  Considering the foregoing, collectively, the Court finds that if released at this time, Aruda remains a danger to the community.  Accordingly, Arruda's request for a sentence reduction is DENIED.[25]

To the extent Aruda requests that the Court convert the remainder of her sentence to a period of home confinement, Dkt. No. 155 at 1–2; Dkt. No. 160 at 14, the Court lacks the authority to do so.  By its terms, Section 3582(c)(1)(A) only

---

[25]*See, e.g.*, *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *1, *3–4 (D. Idaho Apr. 7, 2020) (denying compassionate release to 70-year-old inmate who was blind in one eye, suffering from atrial fibrillation and stage 4 kidney disease, and had served 146 months of his 240-month sentence (previously reduced from 264 months) for distributing methamphetamine near a school and unlawful possession of a firearm because, if released, he would "pose a danger to the community"); *Singui*, 2020 WL 2523114, at *4–5 (denying diabetic inmate's coronavirus-based early release motion because there were "no current reported infections" at the inmate's facility and he "still pose[d] a danger to the community."); *United States v. Hembry*, No. 12-CR-00119-SI-1, 2020 WL 1821930, at *2 (N.D. Cal. Apr. 10, 2020) (denying motion for compassionate release to inmate with diabetes based on COVID-19 risks because the inmate was "housed at a facility with no reported infections" and he still "pose[d] a danger to the community").

permits a court to "reduce the term of imprisonment."  "The [BOP] has the statutory authority to choose the locations where prisoners serve their sentence."  *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (citing 18 U.S.C. § 3621(b) ("The [BOP] shall designate the place of the prisoner's imprisonment.")); 18 U.S.C. § 3624(c)(2) (establishing the BOP's authority to place an inmate in "home confinement").[26]  Of course, a sentencing court may make a "non-binding" recommendation to the BOP regarding where an inmate's sentence should be served. *Ceballos*, 671 F.3d at 855 (citing 18 U.S.C. § 3621(b)).  As a discretionary matter, however, the Court declines to make such a recommendation here, given the evident danger Aruda poses to the community, and leaves that decision, if and when applicable, to the BOP.

//

//

//

---

[26]*See also* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 515–17 (2020) (granting the BOP Director the authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under . . . [18 U.S.C. Section] 3624(c)(2)]," so long as "the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau."); Memorandum from Attorney Gen. to Director of Bureau of Prisons, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.justice.gov/file/1262731/download; *COVID-19 Coronavirus: COVID-19 Home Confinement Information*, BOP, https://www.bop.gov/coronavirus/ (last visited July 16, 2020) (reporting that since March 26, 2020, the BOP has placed 6,979 inmates on home confinement).

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant's motion for compassionate release, Dkt. No. 155, is DENIED.

IT IS SO ORDERED.

DATED: July 17, 2020 at Honolulu, Hawaiʻi.



_____
Derrick K. Watson
United States District Judge

---

_United States of America vs. Patricia Aruda_; Cr No. 14-00577 DKW;
**ORDER DENYING DEFENDANT'S MOTION FOR A SENTENCE REDUCTION**